Kerry J. Jacobson
Assistant United States Attorney
District of Wyoming
P.O. Box 449
Lander, WY 82520
(307) 332-8195
(307) 332- 7104 Facsimile

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 13-CR-126-J |
| v. | ) |
| | ) |
| STANLEY JONES, | ) |
| | ) |
| Defendant. | ) |

**TRIAL MEMORANDUM**

**COMES NOW** the United States of America, by and through its attorney, Kerry J. Jacobson, Assistant United States Attorney for the District of Wyoming, and files the following trial memorandum.

*Introduction:*

The federal public lands in Wyoming at issue in this case, the "Sandstone Allotment," the "Harrington/Wardell" Reservoir area, the "Canady Allotment," "Lookout" and the "New Burlington Allotment" (See attached Overview Map), are managed by the Secretary of the

Department of the Interior through the BLM, and are property owned by the United States. 43 U.S.C. § 1702(e). The federal government has paramount authority to regulate and control the management and use of the property belonging to the United States, including the previously named public lands. The Secretary of the United States Department of Interior, through the Bureau of Land Management, is charged by federal statute to manage federal public lands at issue in this case, in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resource, and archeological values, to provide food and habitat for fish, wildlife, and domestic animals, to provide outdoor recreation and human occupancy and use, and in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber. 43 U.S.C. § 1701(a). In administering the federal public lands, the Secretary is also required to consider and balance these complex and often competing objectives.

The United States has the right, authority, and obligation to protect federal public lands from trespass. Federal regulations provide specific penalties and avenues for appropriate relief to prevent the use of public lands in violation of the permitted uses. 43 U.S.C. § 1733(a). Activities may only be conducted on federal public lands if they are either "authorized use," 43 CFR § 2920.1-1, or "casual use," 43 CFR § 2920.0-5(k). Casual use does not include uses which cause appreciable damage or disturbance to public lands, their resources, or improvements, or any use prohibited by closure of the lands to such activities. 43 C.F.R. § 2920.0-5(k). Unauthorized use of federal public lands, other than casual use, constitutes an unlawful trespass. 43 C.F.R. § 2920.1-2(a) and 4140.1(b)(1)(i).

Livestock grazing is permitted on public land. Grazing on public lands is regulated through a permit system, with grazing rights preferences going to those landowners whose

private land abuts the public land to be grazed. Provisions are also made for permittees to allow others to run cattle in place of the permittee through various arrangements as sub-permittees. A permittee is allowed to hold the grazing right preference and the permit for a section of public land but may choose not to run livestock on the land. If the adjoining landowner to the public land declines the grazing permit, that parcel of land can remain "un-allotted." And, although the State of Wyoming is an open range, "fence out" state--that is livestock are permitted to graze on private land unless the landowner erects a fence to keep them out--the land that is owned by the United States and administered by the BLM is not subject to the open range law, and federal law prohibits grazing on public lands administered by the BLM without a permit. Although there are several methods by which the Defendant could legally graze his cattle on public land, the Defendant in this case has never taken the necessary steps to even apply for such a permit.

During the time period relevant to this case, the Defendant lived in Big Horn County, Wyoming, where he owns cattle but no land whatsoever. The Defendant runs his cattle on his brother, Leroy Jones' property. Leroy Jones owns several parcels of land in the relevant area and is a BLM permittee for the "Canady Allotment." Leroy Jones formerly held a grazing rights preference for the "Sandstone Allotment." Leroy Jones declined the grazing permit for the Sandstone Allotment in 1997, and the Sandstone Allotment is "un-allotted" for grazing purposes.

*Evidence which is Inextricably Intertwined[1]:*

---

[1] The bulk of the information regarding these other crimes has been previously sent to the Defendant, who is acting *pro se*, on a number of occasions. The government is cognizant of its continuing discovery obligation. A small amount of previously unknown information has come into the government's possession during preparation for trial, and that information will be sent to the Defendant contemporaneously with this notice. The Defendant may have disposed of the discovery sent before the previous charges were dismissed without prejudice, so, in an abundance of caution, the entire case file is again being provided with this trial memorandum.

Through testimony of Cameron Henrichsen, Range Management Specialist, the government intends to establish a history between the Defendant and the BLM dating back to 1979. Mr. Henrichsen will testify that in the 1980's the BLM did not have a law enforcement ranger in Wyoming. Consequently, when the Defendant allowed his cattle to graze on public lands, although he did not have a permit and was therefore not authorized to do so, the BLM dealt with the Defendant by issuing him civil trespass notices.[2]

Mr. Henrichsen will testify that a series of trespass notices were issued to the Defendant, beginning in the 1980s:

03/03/89 – Trespass paid by Stanley Jones, 5 AUMs non-willful rate, Sandstone Allotment[3]

08/22/90 – Trespass paid by Leroy Jones, 26 AUMs willful rate, Canady Individual and Dorsey Creek Allotments. The cattle were owned by Stanley and Delbert Jones.

02/19/91 – Trespass paid by Delbert Jones, 2 AUM willful rate, Sandstone Allotment. Some of the cattle were owned by Stanley Jones.

07/02/91 – Trespass paid by Stanley Jones, 1 AUM willful rate, Sandstone Allotment.

12/16/94 – Trespass paid by Delbert Jones, 31 AUMs repeated willful rate, Sandstone Allotment. Trespass notice had been issued to Stanley Jones. Delbert Jones authorized Stanley Jones to act on his behalf with the BLM beginning in March of 1991.

02/27/97 – Trespass paid by Stanley Jones, 2 AUMs repeated willful rate, New Burlington Group Allotment (public lands around Wardell and Harrington Reservoirs).

11/25/98 – Trespass notice issued to Stanley Jones for cattle in the Canady Individual Allotment. This case was never settled and is still considered open.

---

[2] These trespass notices were issued despite the fact that the civil trespass process is reserved for BLM permittees. Civil process is a more friendly process and much cheaper for the violator. The BLM in essence, was trying to do the Defendant a favor by dealing with him in this manner.
[3] The level of trespass is determined by the stocking rate for the parcel of land involved, that is, how many grazing animals the land can support while leaving the land undamaged, the watershed healthy and the land able to support wildlife. The stocking rate is measured in AUMs, or "animal unit months". An animal unit month is the amount of forage necessary for the sustenance of one cow or its equivalent for one month.

There were several occasions of grazing trespass for which the Defendant was not cited. On December 16, 1994, the BLM met with the Defendant. During this meeting, the Defendant agreed to construct new fences to keep his livestock away from the public land and to maintain existing fences.

By 1994, there were those within the BLM who believed that the BLM's "low-key approach" to the Defendant's grazing trespasses had perhaps escalated the problem, and on May 1, 1995, BLM employees met again with the Defendant. A cooperative agreement was entered into, in which the BLM had agreed to allow Stanley Jones to build fences on public lands to connect the lands he ranched on (Leroy Jones' Desert Land Entries) with the state land section leased by Leroy Jones.[4] The Defendant was to bear the cost of the fences, as it was his responsibility to fence state lands away from public lands. The Defendant requested that a grazing permit for the Sandstone Allotment be consolidated with the grazing permit for Canady that was already in Leroy Jones' name. The BLM agreed to the transfer, but requested a copy of the documents showing that Leroy Jones was the owner of the base property. However, this information was never supplied to the BLM.

In June of 1995, cattle belonging to Delbert and Stanley Jones were observed on two separate occasions trailing between the Jones' Desert Land Entries and public lands around Wardell/Harrington Reservoirs. No trespass notice was issued.

On July 27, 1995, the BLM sent a letter to the Defendant indicating that he had not yet constructed the necessary fences on Leroy Jones' DLE lands and was continually allowing

---

[4] Leroy Jones obtained several parcels of (previously) public lands through the Desert Land Entry Act, passed in 1877, which had as its purpose to encourage and promote irrigating and planting on arid lands, with the belief that human settlement would follow. 43 C.F.R. §§ 2520, 2520.0-1. Leroy Jones has patents for the DLE lands.

livestock to graze without fences to constrain them, which resulted in repeated unauthorized livestock grazing on public lands in the Wardell/Harrington Reservoir area.

In December of 1995, cattle belonging to Stanley Jones were reported on public land on three separate occasions. No trespass notices were issued and the Defendant removed the cows.

In January of 1997, cattle were seen around Wardell Reservoir on New Year's Day. On January 6, 1997, 48 cattle belonging to Stanley Jones were observed on public lands around Wardell Reservoir. A trespass notice was issued to Stanley Jones on January 7, 1997. Stanley Jones was contacted by telephone and told about the trespass notice the following day. The Defendant paid this trespass.

A letter dated February 14, 1997, from Joseph Vessels, Bighorn Basin Assistant Area Manager, to Stanley Jones, canceled a cooperative agreement that the BLM had entered into with Stanley Jones for building fences. The letter notified Stanley Jones that his failure to complete necessary fencing and maintain existing fences had created a continual problem of unauthorized livestock grazing use on public lands surrounding Wardell and Harrington reservoirs. The BLM and the Wyoming Game and Fish Department built the needed fences to keep livestock away from Wardell and Harrington Reservoirs and notified Stanley Jones that he was to build fences around Leroy Jones' DLE land.

In 1998, the BLM's administrative side essentially ceased to have dealings with the Defendant because he was not an authorized permittee and did not hold a grazing permit to run livestock on public lands. Since that time, livestock grazing by Stanley Jones on public lands has been referred to the BLM's law enforcement program.

Beginning in January of 2010, BLM Law Enforcement Ranger Aaron Kania began working with the Defendant to keep his cattle off of public land administered by the BLM,

meaning that Ranger Kania warned the Defendant when his cattle were on public lands and assisted him in herding them off public lands. Ranger Kania documented repeated instances of the Defendant allowing his cattle to graze on public land.  Since that time, the Defendant has taken the stance that he did not knowingly and willfully allow his cattle to graze on public land, but that his cattle were mistakenly let onto public land through no fault of his own when a hunter or recreationist left a gate open.  Alternatively, the Defendant has also claimed "it's all family" referring to Leroy Jones' status as a permittee on the Canady Allotment.  The Defendant has also claimed a BLM employee gave him "permissive use" over several parcels of public land, including the "un-allotted" Sandstone Allotment and the area relevant to count one of the information where he has his personal property and refuse stored on public lands.

On January 24, 2010, Ranger Kania saw 18 head of cattle on public lands administered by the BLM in the area of the dam at Wardell Reservoir.  Several of the cattle were branded with the Defendant's brand.  Some of the cattle had white ear tags written with black and other cattle had no identifiers.  Ranger Kania said the cattle were black and white.  The cattle were going around the cattle guard at the entrance to Wardell Reservoir.  Ranger Kania shut the gate, but the wire fence attached to the cattle guard was in such poor repair that the wires were lying on the ground.  Also, there was enough room between the gate and a canal that the cows could go around and enter public lands.  Ranger Kania called the Defendant and left him a message regarding the cows grazing on public lands.  When the Defendant returned the call, Ranger Kania asked if the cattle were the Defendant's and the Defendant said that they were.  The Defendant told Ranger Kania that the breed of cattle he owned was British Whites.  On January 30, 2010, Ranger Kania saw approximately 15 head of cattle, which appeared to be British White breed, grazing on public lands in the Wardell Reservoir area.  Several of the cows were branded

with the Defendant's brand. On that date, Ranger Kania met with the Defendant who confirmed they were his cattle and said he would fix the fence. On February 6, 2010, Ranger Kania saw 7 head of cattle on public lands in the Wardell Reservoir area. Several of the cows were branded with the Defendant's brand and they were British Whites. Ranger Kania spoke with the Defendant and asked if he had a chance to repair the fences and move the cows out of the Wardell Reservoir area since January 30, 2010. The Defendant indicated he had worked out there for two days and was trying to move the cows to a lower pasture. On February 8, 2010, the Defendant contacted Ranger Kania and said he had removed the cows. On February 10, 2010, on public lands administered by the BLM in the area of Harrington Reservoir, Ranger Kania saw 6 head of cattle grazing without authorization. One of the cows was branded with the Defendant's brand. Ranger Kania contacted the Defendant and the Defendant said he would remove the cows. (There are 10 photographs taken by Ranger Kania in support of this trespass allegation). The Defendant was cited with grazing without authorization in violation of 43 C.F.R. 4140.1(b)(1)(i) and paid the fine.

On August 27, 2011, Ranger Kania saw approximately 43 head of cattle grazing on public lands in the area near the Sandstone Reservoir. These cattle were mostly British Whites and 10 of the cattle had been branded with the Defendant's brand. Numerous cattle did not appear to have a brand. On September 5, 2011, Ranger Kania saw 45 head of cattle in the same area, 6 of which had been branded with the Defendant's brand. (Thirteen photographs taken by Ranger Kania support this trespass allegation).

On November 6, 2011, Ranger Kania saw approximately 45 head of cattle in trespass on public lands on the Sandstone Allotment. It appeared as though cattle had been trailed from the

south side of the Sandstone Allotment to Leroy Jones' deeded land. The route crossed public lands at several locations.

On January 8, 2012, Jeanette Tolman, a neighboring rancher familiar with the Defendant's cattle, reported that the Defendant's cows had been on her private land several times during the preceding weeks. Later that day Ranger Kania saw approximately 42 head of cattle immediately west of public lands grazing on private land. No fence exists to separate the private land from the public lands in that area. Ample evidence existed that the cattle had grazed on BLM due to hoof prints in the snow and fresh manure on top of the snow. Ranger Kania photographed the cattle. The cattle appeared to be the same cattle that Ranger Kania had seen in trespass previously. At least one cow had a brand that looked similar to Stanley Jones. Most of the cows were the British White breed and had white ear tags.

On January 12, 2012, Ranger Kania met with State Livestock Board Brand Inspector Jeff McManus on public lands administered by the BLM. There were approximately 24 head of cattle at the intersection of Road 16.5 and Lane 43 (on public lands). Brand Inspector McManus attempted to approach the cattle to identify them, but could not because the cattle moved away. Ranger Kania and Brand Inspector McManus drove to another location on public lands (the "Brown gate" with the cattle guard which separates "the old Canady place" from the larger portion of public lands within the Canady Allotment). Ranger Kania and Brand Inspector McManus saw approximately 20 head of cattle grazing on public lands. Brand Inspector McManus identified most of the cattle as belonging to the Defendant and some of the cattle as possibly belonging to Dustin or Kimberly Loveland (the Defendant's daughter and son-in-law who reside in Colorado). Ranger Kania saw an orange irrigation tarp that had been thrown over the cattle guard with dirt on top of the tarp, which allowed the cattle to pass easily over the cattle

guard. Ranger Kania knew the tarp and cattle guard had been in that condition since at least June of 2011. Ranger Kania also located an area of fencing which had been compromised by a Russian Olive tree laying on the fence, which did not appear to be a recent event. The tree had forced the fence down so that the cattle could simply walk over the fence. The Defendant told Brand Inspector McManus that he had known about the cattle on public land and had planned to move them. On January 15, 2012, Ranger Kania went back to the area of the "Brown gate" and located 2 head of British White cattle on public lands. (There is a brand inspection document and 22 photographs taken by Ranger Kania in support of this trespass allegation).

On March 15, 2012, Brand Inspector McManus saw 12 head of cattle belonging to the Defendant grazing on public lands in the area of the "Brown gate". (There are 3 photographs and a brand inspection document in support of this trespass allegation). Brand Inspector McManus left messages for the Defendant regarding the cattle in trespass.

On September 19, 2012, Jeanette Tolman reported to Ranger Kania that the Defendant's cattle had been on her private property every day that week.

On September 27, 2012, Jeanette Tolman reported to Ranger Kania that 12 of the Defendant's cows were on public land the preceding day. Tolman said the Defendant's cows had been on her private property for 13 days straight. Later that same day, Ranger Kania saw 4 head of cattle grazing on public lands in the area known as the Canady Allotment. Although he could not see a brand on any of the cattle, Ranger Kania recognized the cows as being the same breed as the cattle owned by the Defendant. In the area where the cattle were located, Leroy Jones' private land abuts public lands, with a section of fence which has not been completed, allowing the cattle to roam freely across the property line. (Two photographs taken by Ranger Kania support this trespass allegation).

On February 7, 2013, Ranger Kania saw several head of cattle on public land in the area of Wardell Reservoir and recognized them as likely belonging to the Defendant. A closer inspection of the area showed old and new footprint and the area appeared to have been extensively grazed. Ranger Kania also located a set of tire tracks which were made by a dual wheel pickup. Ranger Kania knew the Defendant to drive a dual wheel pickup. Brand Inspector McManus came to the area at Ranger Kania's request. As Ranger Kania and Brand Inspector McManus were preparing to identify the cattle on public land, the Defendant drove by. Brand Inspector McManus held his arm out and his hand up and attempted to stop the Defendant's vehicle. The Defendant waved and continued on. Brand Inspector McManus identified the cattle as belonging to the Defendant. Brand Inspector McManus spoke with the Defendant at his residence to let him know the cattle were out. The Defendant said it had not been him in the truck which had passed by Ranger Kania and Brand Inspector McManus. He said he would go remove the cattle. Later that day Ranger Kania located the Defendant's cattle on private land belonging to Leroy Jones, which abutted the public land the cattle had been on earlier. However, there were no fences to keep the cattle from returning to public land. (There are 11 photographs taken by Ranger Kania to support this trespass allegation).

On February 27, 2013, Ranger Kania saw 27 head of the Defendant's cattle on public lands in the area of Wardell Reservoir. Ranger Kania herded the cattle onto the private land, but there were no fences to keep them there and it looked as though the cattle were running out of feed. At least one cow seen by Ranger Kania was branded with the Defendant's brand. (Two photographs by Ranger Kania support this trespass allegation).

On July 22, 2013, Ranger Kania was contacted by William Moffett, a property owner in Otto, Wyoming, who said there were 6 cattle on his property that he believed belonged to the

Defendant, based on prior experience with these cattle. Brand Inspector McManus came to Moffett's property accompanied by Dustin Loveland, the Defendant's son-in-law. Loveland admitted the cattle on Moffett's property belonged to the Defendant. He said they would be out the following day to round up the cows and move them. The Defendant's cattle could not have been on Moffett's property without crossing public lands. On August 3, 2013, William Moffett called Ranger Kania to report that the Defendant's cattle had returned. Moffett moved them from his property. On August 4, 2013, Ranger Kania saw 7 head of cattle again on Moffett's property, which they could not have reached without crossing public lands. One cow was branded with the Defendant's brand and had a white ear tag. At 5:30 p.m., Ranger Kania and William Moffett herded the cattle onto private property belonging to Leroy Jones. However, there was no fence to keep the cattle off of public land. At 9:06 p.m. that same day, William Moffett telephoned Ranger Kania to let him know the Defendant's cattle were back on his property.

    *Law:*

The United States believes that the evidence outlined above is "inextricably intertwined" with the evidence of the crimes charged in the information against the Defendant. The evidence will help the government present a coherent case and the acts described above are directly relevant to prove the intent required for the charges pending against the Defendant and provide relevant background information for the jury. These facts should be admissible *res gestae* – part and parcel of the proof of the offenses contained in the information. As such, this evidence is not believed to be subject to the provisions of Rule 404(b). *See, United States v. Lambert,* 995 F.2d 1006 (10th Cir. 1993).

As was stated in the jury instructions filed by the government, the elements the government must prove as to the counts charged include a "knowingly and willful" requirement, therefore, as is clear, these violations are not "strict liability" crimes, that is, a simple finding of cows or personal property stored on public land does not automatically mean that a person has violated the law. Honest mistakes and inadvertent violations are not considered to be criminal violations. The Code of Federal Regulations specifically provides that the "knowing or willful nature of the conduct may be established by plain indifference to, or reckless disregard of the requirements of law." 43 C.F.R. § 2920.0-5(m). Furthermore a "consistent pattern of performance or failure to perform also may be sufficient to establish the knowing and willful nature of the conduct." (*Id.*).

In light of this specific intent requirement the government will present the above evidence as facts which are "inextricably intertwined" with the offenses, that is they are *res gestae* of the crimes charged. Through this evidence, the United States will establish that the Defendant has had ample notice from the BLM that he was not allowed to graze his livestock on public land - - not just public land in general, but the specific parcels of public land at issue in the charged offenses. Indeed the evidence will show the charged offenses are not isolated events, but rather part of long-running dispute between the BLM and the Defendant. Such context will help the jury understand the extent of the Defendant's ability and opportunity to prevent such unlawful grazing.

The Tenth Circuit has held that "intrinsic evidence is that which is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *United States v. Irving,* 665 F.3d 1184, 1212 (10th Cir.2011). Rule 404(b) only applies to evidence of acts extrinsic to the charged crime. *United States v. Parker,* 553 F.3d 1309, 1314

(10th Cir. 2009). Evidence of incidents that are "inextricably intertwined" with the charged offense are admissible independent of Rule 404(b). *United States v. Oles*, 994 F.2d 1519, 1522 (10th Cir. 1993). "Other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged. *United States v. Lambert,* 995 F.2d 1006, 1007 (10th Cir.1993). The acts described above form an integral and natural part of the witness' accounts of the circumstances surrounding the offenses for which the defendant is charged and provide a direct link to the Defendant's knowledge regarding the status of the land and the willful nature of his actions.

The above evidence is also more probative than prejudicial, as it should be, under Rule 403, Fed. R. Evid. "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case. *United States v. Martinez,* 938 F.2d 1078, 1082 (10th Cir. 1991). Instead, to be unfairly prejudicial the evidence must have "an undue tendency to suggest decision on an improper basis." *Id.* None of the above acts suggest the jury should make a decision on any improper grounds. All the evidence is "part and parcel" of the continuing, chronic nature of the Defendant's trespasses on public lands. Viewed in this light, the evidence is not unrelated and remote, but is integrally related to the criminal activity charged in the information.

DATED this 12th day of September, 2013.

Respectfully submitted,

CHRISTOPHER A. CROFTS
United States Attorney
District of Wyoming


*/s/ Kerry J. Jacobson*
Kerry J. Jacobson
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12th, 2013, I served a copy of the foregoing **TRIAL MEMORANDUM** upon the following by federal express addressed to:

Mr. Stanley Jones
135 Main Street
Otto, Wyoming 82434

          */s/ Kerry J. Jacobson*
          KERRY J. JACOBSON
          Assistant United States Attorney

